FILED
U.S. DISTRICT COURT

2014 SEP -2 P 1: 09

DISTRICT OF UTAH

DEPUTY CLERK

**SAMANTHA R. HAJICEK**
Samantha2014@Hajicek.com
19400 E. 37th Terrace Court South #214
Independence, Missouri  64057
816-536-4662

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | | |
|---|---|---|
| SAMANTHA R. HAJICEK. | : | |
| | : | |
| Plaintiff, | : | **COMPLAINT** |
| | : | |
| vs. | : | |
| | : | |
| VERNON HEPERI, individually and in | : | |
| his capacity as Associate Student Life | : | |
| Vice President & Dean of Students for | : | |
| Brigham Young University; GLORY | : | |
| DRAKE,  individually and in her | : | |
| capacity as an employee of Brigham | : | |
| Young University; LACEY | : | |
| REYNOLDS  individually and in her | : | Case: 2:14cv00640 |
| capacity as an employee of Brigham | : | Assigned To : Pead, Dustin B. |
| Young University; JAY BROWN, | : | Assign. Date : 9/2/2014 |
| individually and in his capacity as an | : | Description: Hajicek v. Heperi et al |
| employee of Brigham Young | : | |
| University; JEFF VEST, individually | : | |
| and in his capacity as a law enforcement | : | |
| officer with the Brigham Young | : | |
| University Police Department; CRAIG | : | |
| MERRILL, individually and in his | : | |
| capacity as a law enforcement officer | : | |
| for the Brigham Young University | : | |
| Police Department; RYAN JUDD, | : | |
| individually and in his capacity as a law | : | |
| enforcement officer for the Brigham | : | |
| Young University Police Department; | : | |
| BRAD BURR, individually and in his | : | |
| capacity as a law enforcement officer | : | |
| with the Brigham Young University | : | |
| Police Department; ROBERT EYRE, | | |
| individually and in his capacity as a law | | |
| enforcement officer with Brigham | | |

Young University Police Department;
JOHN DOE #1, individually and in his
capacity as a law enforcement officer
with Brigham Young University Police
Department; JOHN DOE #2,
individually and in his capacity as a law
enforcement officer with Brigham
Young University Police Department;
BRIGHAM YOUNG UNIVERSITY, a
Utah nonprofit corporation; THE
CORPORATION OF THE
PRESIDENT OF THE CHURCH OF
JESUS CHRIST OF LATTER-DAY
SAINTS, a Utah corporation sole; THE
CORPORATION OF THE PRESIDING
BISHOP OF THE CHURCH OF JESUS
CHRIST OF LATTER-DAY SAINTS,
a Utah corporation sole; THE CHURCH
OF JESUS CHRIST OF LATTER-DAY
SAINTS, an unincorporated association;
ADDIE BRADBURN, individually and
in her capacity as a nurse at Utah Valley
Regional Medical Center; and
INTERMOUNTAIN HEALTH CARE,
INC., a Utah corporation which operates
Utah Valley Regional Medical Center.

Defendants

COMES NOW the plaintiff Samantha R. Hajicek, *pro se*, and complains of the above

named defendants as follows:

**PARTIES**

1.      Plaintiff Samantha R. Hajicek ("Samantha") is a resident of Jackson County,

Missouri, and is over the age of 18 years.

2.      Upon information and belief, defendant Vernon Heperi is a resident of Utah

County, Utah, and is over the age of 18 years, and during all times relevant to Samantha's claims

he was acting in his capacity as Associate Student Life Vice President and Dean of Students for

Brigham Young University ("BYU") — overseeing the BYU Honor Code Office, BYU On-Campus Housing, and the BYU Police Department.

3.     Upon information and belief, defendant Glory Drake is a resident of Utah County, Utah, and is over the age of 18 years, and during the dates relevant to Samantha's claims was working for BYU On-Campus Housing.

4.     Upon information and belief, defendant Lacey Reynolds is a resident of Utah County, Utah, and is over the age of 18 years, and during the dates relevant to Samantha's claims was working for BYU On-Campus Housing.

5.     Upon information and belief, defendant Jay Brown is a resident of Utah County, Utah, and is over the age of 18 years, and during the dates relevant to Samantha's claims was working for BYU On-Campus Housing.

6.     Upon information and belief, defendant Jeff Vest is a resident of Utah County, Utah, and is over the age of 18 years, and during the dates relevant to Samantha's claims was working in his capacity as a law enforcement officer for the Brigham Young University Police Department ("BYU PD").

7.     Upon information and belief, defendant Craig Merrill is a resident of Utah County, Utah, and is over the age of 18 years, and during the dates relevant to Samantha's claims was working in his capacity as a law enforcement officer for the BYU PD.

8.     Upon information and belief, defendant Ryan Judd is a resident of Utah County, Utah, and is over the age of 18 years, and during the dates relevant to Samantha's claims was working in his capacity as a law enforcement officer for the BYU PD.

9.     Upon information and belief, defendant Brad Burr is a resident of Utah County, Utah, and is over the age of 18 years, and during the dates relevant to Samantha's claims was working in his capacity as a law enforcement officer for the BYU PD.

10.     Upon information and belief, defendant Robert Eyre is a resident of Utah County, Utah, and is over the age of 18 years, and during the dates relevant to Samantha's claims was working in his capacity as a law enforcement officer for the BYU PD.

11.     Defendant Brigham Young University ("BYU") is a Utah nonprofit corporation located in Provo, Utah, operating as a private university which says it is sponsored by The Church of Jesus Christ of Latter-day Saints ("LDS Church").

12.     Defendant The Corporation of the President of the Church of Jesus Christ of Latter-day Saints ("COP") is a Utah corporation sole which, on information and belief, owns Brigham Young University.

13.     Defendant The Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints ("CPB") is a Utah corporation sole which is a controlled corporation of COP as a holding company for real property of COP.

14.     Defendant The Church of Jesus Christ of Latter-day Saints ("LDS Church") is an unincorporated association but also a d/b/a and registered trademark licensed to defendants BYU, COP, and CPB — which LDS Church defendants COP and CPB say does not exist as a legal entity and has no assets but defendant BYU says sponsors defendant BYU.

15.     Upon information and belief, defendant Addie Bradburn is a resident of Utah County, Utah, and is over the age of 18 years, and during the dates relevant to Samantha's claims

was working as an emergency room or trauma nurse at Utah Valley Regional Medical Center ("UVRMC").

16.     Upon information and belief, defendant Intermountain Health Care, Inc. ("IRC") is a Utah corporation which owns UVRMC as a d/b/a of IRC.

**JURISDICTION**

17.     Pursuant to 29 U.S.C. §1332(a)(1) the Court has diversity jurisdiction in this matter as the controversy is between citizens of different states and the amount in controversy exceeds $75,000.

18.     Pursuant to 29 U.S.C. §1391(a)(1)(2) venue is proper in the District Court for the District of Utah because the transactions and occurrences giving rise to Samantha's claims occurred in Utah.

**FACTS GIVING RISE TO SAMANTHA'S CLAIMS**

19.     Although BYU is a private institution, it is permitted under the laws of the State of Utah to operate its own private police department.

20.     Unlike a public law enforcement agency, the BYU PD is operated with private rather than public funds.

21.     Although the BYU PD is a private police force, the department itself and its individual officers are certified by the State of Utah, and are considered law enforcement officers whose powers, duties, and obligations are defined by the Utah Constitution, Utah law, the United States Constitution, and applicable federal law.

22.     Samantha, during all relevant periods, was enrolled as a student at BYU but remained a citizen of Missouri with the intent to return to Missouri when not attending school at BYU.

23.     Samantha arrived at BYU with a 4.0 grade point average, and a college entrance exam score higher than the BYU average; she was a violinist, and was an award-winning marathoner and cross-country running star — Samantha was a high achiever, but had post-traumatic stress and developed an eating disorder at a young age which she was managing under the care of physicians (while recognized by her physicians and eventually by the U.S. Social Security Administration as a disabled person).

24.     Samantha was not a member of the LDS Church, and had many choices in her education; Samantha was a student at Washington University in St. Louis at age 16 and 17 where she received straight A grades; she chose honorably to attend BYU as a non-member. While at BYU Samantha also had a 4.0 grade point average.

25.     BYU students are required to live by the standards set by the BYU Honor Code which prohibits students from certain activities such as drinking alcohol and engaging in premarital sex; Samantha valued those standards with the same interest as any BYU student; Samantha's sister Jessica successfully attended BYU and graduated by age 20, while keeping the honor code. Samantha did not have any sexual contact while at BYU.

26.     BYU enforces its Honor Code and disciplines students for violations of the code through its Honor Code Office, and generally offers forgiveness and counseling for students determined to reform.

27.     During her time as a student, Samantha lived on campus in BYU-provided housing at Helaman Halls; the managers learned that she was a non-member and moreover that she was a member of a minority faith.

28.     Upon information and belief, Samantha as a resident of Helaman Halls was subject to harassment and threats by BYU On-Campus Housing employees Glory Drake, Lacey Reynolds, and Jay Brown.   Those employees threatened in writing to have her evicted from Helaman Halls without time to find a new home because of her eating disorder and mental health; required her, unlike other residents, to clean public restrooms using highly toxic industrial cleansers that caused her to become extremely ill as punishment for her eating disorder; limited her to only one bathroom on the campus; called the police on her in the night to have the police intrude in her room for no other reason than her eating disorder while housing employees Glory Drake and Lacy Reynolds eavesdropped; the police transported her in a police car to therapy; and otherwise used public humiliation and bullying about her eating disorder to ostracize her and isolate her at BYU as a rare non-member and a member of a minority faith.

29.     Samantha's disability was protected under the Americans with Disabilities Act (42 U.S.C. §§ 12181–12189) and the Fair Housing Act (42 U.S.C. §§ 3601-3619).

30.     Samantha's mistreatment by BYU On-Campus Housing employees caused her depression and anxiety, which in turn resulted in her requiring medical care including anti-depressants and anti-anxiety medications, the side-effects of which were detrimental to her ability to think clearly and worsened her situation overall.

31.     Samantha's mistreatment by BYU On-Campus Housing employees caused her to seek comfort and consolation in a group called "Non-LDS at BYU" which also networked with

students from nearby Utah Valley University, and it was at this time, June 8, 2012, that Samantha was invited to a bonfire at the home of Allen Bradford in Spanish Fork, Utah.

32.     When Samantha arrived at Allen Bradford's home for the bonfire, individuals named Allen Bradford, Jessica Taylor, Dallas Youngblood, Jordan Reece, and Adam Scholle were present and Samantha brought only a soft drink.

33.     Although Samantha was only 18 years old and unable to obtain alcohol, the other bonfire participants well over the age of 21 knowingly encouraged her to drink rum made from sugar, pouring Samantha extreme amounts of rum without her knowing or understanding the effects or consequences.  Adam Scholle confessed to Samantha's father that he brought the rum, during a recorded telephone conversation on June 9, 2012.

34.     Within 27 minutes of her arrival at the bonfire, Samantha lost consciousness from the amount of alcohol provided to her, while attempting to send an emergency text a female BYU graduate student arranged by her family to be her emergency contact at BYU.

35.     Choosing to dispose of rather than assist an unconscious Samantha, the bonfire participants conspired and devised a plan to surreptitiously rid themselves of Samantha's unconscious body, steal her medications (none were found in her blood), and keep her phone to delete the text messages implicating them in her accident.

36.     The bonfire participants all agreed that Jordan Reece would drive Samantha's car to BYU and Dallas Youngblood would follow in his own car to pick up Jordan Reece.

37.     Pursuant to the bonfire participants' plan to ditch Samantha's body, she was carried to her vehicle and placed in the backseat unconscious.

38.     When Jordan Reece arrived at BYU at approximately midnight on the morning of June 9, 2012, he parked Samantha's car in a random BYU parking lot, leaving Samantha's body in the back seat unconscious, locked her car doors, and left with Dallas Youngblood.

39.     With a curfew and 800 surveillance cameras, BYU On-Campus Housing and the BYU PD failed to note her missing or being left in the parking lot, or to in any way protect her.

40.     Samantha was not discovered until approximately 1:30 p.m. the following June day, almost 14 hours after she was abandoned by the bonfire participants.  Immobilized in a locked black car, with its windows rolled up, Samantha's body temperature had reached 104 degrees and she was in a coma.

41.     BYU PD law enforcement officers responded to the scene and removed Samantha from her vehicle; even though those present describe them leisurely unlocking her car doors protectively of the car, defendants Officer Jeff Vest and Officer Craig Merrill then pulled her from the vehicle impulsively and roughly; Samantha now suffers from damage to her brachial plexus and widespread nerves in her arms and shoulders, and consequently has permanent pain and permanent partial loss of use of her shoulders, arms, hands, and fingers.

42.     Paramedics transferred Samantha to the Utah Valley Regional Medical Center ("UVRMC") where she remained unconscious and in a coma for two days.

43.     Because she was in the warm car so long, Samantha also suffered pressure blisters over her body and permanent scarring; and she suffered scrapes that suggest she was dragged along the ground at some point, all ultimately as a result of being banished emotionally by the housing employees.

44.     Defendant Jeff Vest assisted in removing Samantha from her car and after contacting Samantha's father in Missouri, continued his investigation at UVRMC.

45.     Defendant Craig Merrill conducted an unwarranted search of Samantha's residence and private papers and personal effects at her residence across campus.

46.     Upon information and belief, Officer Vest was informed by an emergency room nurse, defendant Addie Bradburn, that "it was clear that she [Samantha] had participated in sexual intercourse," which later proved to be unfounded and slanderous.

47.     Based on this information Officer Vest initiated a sexual assault investigation.

48.     Fluid samples were reportedly taken from Samantha by medical staff.

49.     Upon information and belief, Officer Vest, while at the hospital, communicated with Defendant Vernon Heperi who was acting in his capacity as Dean of Students.

50.     Upon information and belief, Officer Vest informed Dean Heperi of the circumstances regarding Samantha's hospitalization including that "it was clear that she had participated in sexual intercourse."

51.     Upon information and belief the investigation was subsequently turned over to BYU PD detectives Brad Burr and Robert Eyre.

52.     Upon information and belief Officer Burr was informed by Officer Vest and the hospital nurse of their concern that Samantha was possibly the victim of a sexual assault.

53.     Ultimately there was no physical evidence nor were there witnesses to support the theory that Samantha was sexually assaulted or had consensual intercourse either; but nevertheless the BYU PD continued on course with the presumption that there was consensual intercourse.

54.     The police conducted their investigation without the professionalism of a criminal investigation with Samantha as a potential victim, but instead set-out to investigate Samantha in the form of an Honor Code investigation — investigating her as the victim instead of investigating her perpetrators, photographing evidence no more robust than her energy-supplements and her gummy bear candy.  The police obtained her phone, but not the suspects' phones; they searched her home, but not the suspects' homes; they refused to seek evidence substantiating the victim's version of events, and instead readily accepted the perpetrators version which had no credibility.

55.     In all of their investigations, the police shunned offers of information to exonerate Samantha offered by Samantha or her family including a recording of the main suspect confessing; and they avoided leads like surveillance video at the State Liquor Store; thus, the police relied on information from the perpetrators to suspend or expel the victim rather than relying on the victim to prosecute the perpetrators.

56.     The police found nothing in the way of chastity violations except third-hand hearsay from her perpetrators that even then did not amount to sexual contact to any degree whatsoever.

57.     Samantha's father flew to Utah, and video recorded most of his interactions with the police; including defendant Ryan Judd, a sergeant with the BYU PD, who assured him on June 10, 2012 during a video-recorded conversation, that "the honor code office and the police department are entirely separate and do not share files or information."  Defendant Judd contracted with Mr. Hajicek to protect Samantha's privacy if Samantha's father and sister were to grant access to her telephone and electronic social media and answer intimate questions.

58.    On August 6, 2012, BYU PD detectives and multiple police employees during another video-recorded conversation admitted to Samantha's father that in fact they not only share with the Honor Code Office, but that they share everything, and even have "a full-time liaison whose only job is to share information with the Honor Code Office" — they also refused to give Samantha and her family copies of the police report already in the possession of the Honor Code Office.

59.    But not for the lies of the police, and their breached contract to protect Samantha academically, and their invasion of her privacy by obtaining and sharing misleading medical records, the Honor Code Office could not have suspended or expelled her.

60.    All aspects of Samantha's medical treatment were confidential and protected by the doctor-patient privilege, as well as other Utah and federal statues protecting patient privacy.

61.    Medical providers, including nurses are prohibited by law from disclosing information regarding a patient's medical diagnosis, treatment and prognosis to third parties without the consent of the patient.

62.    An exception to this prohibition exists if a medical provider has reason to believe a patient was sexually assaulted.

63.    At the time the UVRMC nurse disclosed to Officer Vest her conviction that "it was clear that she had participated in sexual intercourse," she could only do so under her legal obligation to report a suspicion of sexual assault and disclosed that suspicion to Officer Vest solely in his role as a law enforcement officer.

64.    Officers Vest, Burr, and Eyre made repeated visits to see Samantha in the hospital, personally examining her without warrant while she was undressed and unconscious in

the UVRHC trauma room under the supervision of nurse Addie Bradburn; and later entering her ICU room where they were to privy to conversations between the patient, her family, and her health care providers; and the officers talked freely with health care providers who were members of their LDS Church.

65.    The Honor Code Office sent student-spies to Samantha's private hospital room pretending to befriend her and ask her personal questions about her conduct as it related to the Honor Code.

66.    Even the vice president of BYU, Kevin Worthen (former dean of the law school and now president of BYU) came to visit Samantha's ICU room incognito, stating only that he was "an employee of BYU" to administer to her even though she was not a member of the LDS Church, and thus assessed her condition and gathered hospital-room conversations.

67.    Samantha's medical diagnosis and treatment while she was hospitalized at UVRMC was provided by medical staff to Officer Vest, Officer Burr, and Officer Eyre, solely in their capacities as BYU police officers investigating a possible sexual assault committed against Samantha and the defendant officers' representation that they were conducting such an investigation.

68.    Defendant Officers also questioned Samantha's family and represented to the family that they were investigating a potential sexual assault and other possible crimes committed against Samantha.

69.    Upon information and belief the defendant police officers questioned Samantha's family (including her absentee-mother) about immensely private aspects of Samantha's life such as her past sexual behavior, looking for speculation about past boyfriends.  At the time they

requested this information, the defendant police officers represented to the family that the information was necessary to their criminal investigation and the protection of Samantha and that the information would be used solely for the purpose of their criminal investigation and would not be disclosed to BYU.

70. On June 11, 2012, Samantha regained consciousness but remained confused, disoriented, and delusional.

71. That following day, June 12, 2012, Officers Burr and Eyre continued their investigation by interviewing Samantha, and the Defendant Officers assured Samantha the information sought was necessary to their sexual assault investigation, for her protection, and would be used solely for the purposes of their criminal investigation and would not be disclosed to BYU.

72. On information and belief, Robert Eyre and Brad Burr claimed falsely that Samantha signed a medical release on June 12, 2012 when they knew she was mentally and physically incapable of signing the form, or even giving consent. On information and belief, she never signed the form, and the officers must have forged her signature as her hands were paralyzed.

73. Attempting to determine how Samantha, an underage woman, allegedly came to possess or consume alcohol, the officer questioned Samantha about her past sexual behaviors and alcohol use and how she allegedly came to consume alcohol June 8, 2012.

74. Police intentionally inflicted severe emotional distress by the intimacy and depth of their interrogations in the ICU room at UVRMC.

75.     Upon information and belief it is alleged Samantha stated that bonfire participants Scholle, Reece, Youngblood, Taylor and Bradford provided her with rum.

76.     Upon information and belief it is alleged that Samantha stated that after drinking their rum she had to lie down on the grass and does not recall anything until she woke up in the hospital.

77.     In trying to determine if Samantha had been sexually assaulted, Officers Burr and Eyre asked Samantha to submit to a Code R examination (sexual assault exam).

78.     Samantha agreed to the Code R examination.

79.     Upon information and belief Officer Burr received the results of the Code R examine which failed to find evidence that Samantha had engaged in sexual intercourse on the night of June 8, 2012, or the morning of June 9, 2012, or that she had otherwise been sexually assaulted.

80.     Furthermore, no evidence uncovered during the investigation indicated that Samantha had ever been sexually active or engaged in sexual intercourse on any prior occasions.

81.     As a result of the bullying by BYU On-Campus Housing, from the loss of most movement of her hands, and from the interrogations by the police, Samantha was under severe emotional distress at the hospital on June 12, 2012; discharging herself against medical advice, heavily sedated, and in a confused state.

82.     In this heavily sedated, distressed, and confused state, Samantha overdosed in her dorm room after defendant Glory Drake (employed by BYU On-Campus Housing) opened multiple bottles of pills in Samantha's dorm room; Samantha was taken back to the hospital by

her father unconscious after Glory Drake and other BYU On-Campus Housing employees tried to stop him; Samantha continues to suffer from severe emotional distress from these events.

83.     Samantha continues to suffer physical impairment from injuries she sustained in the June 8-9, 2012 accident, and more specifically permanent widespread neuropathy in both arms and hands, and severe chronic pain that impairs her ability to work or progress in school, and is subsequently permanently in pain and permanently disabled from her injuries.

84.     On or about August 2, 2012, Samantha was informed by the BYU Honor Code Office she was being investigated for violation of the BYU Honor Code related to: (1) alcohol consumption; (2) prescription drug abuse; (3) chastity; and (4) honesty; Dean Vernon Heperi persuaded the family to end a therapeutic vacation for Samantha in Florida with the promise that she would remain a student at BYU, and induced the whole family to fly to Utah for an Honor Code review, all at a great expense emotionally and financially.

85.     On or about August 3, 2012, a detective told the family on a recording that Dean Heperi would be patient with Samantha's violations of the honor code, but that their true concern was her "psychological health" that might get her suspended or expelled — a clear violation of federal law.

86.     On August 6, 2012, Samantha met with Dean Vernon Heperi regarding her alleged violations of the Honor Code.  During that meeting Dean Heperi confronted Samantha with detailed confidential information regarding her hospitalization on June 9, 2012, including privileged information regarding her medical treatment, confidential information regarding her Code R exam, confidential information regarding the alleged sexual assault committed against

her, and confidential information allegedly provided by her and her family to the BYU PD officers investigating the alleged sexual assault.

87.     BYU, through Dean Heperi, treated this confidential information as evidence that Samantha was unchaste, and abused drugs; even though the medical reports disproved their intercourse theory, there were no prescription or non-prescription drugs in her body, and only legally prescribed medications were found in her room.

88.     During the August 6, 2012, meeting Dean Heperi confronted Samantha with confidential and privileged information gathered by the investigating officers during their investigation of the alleged sexual assault committed against Samantha, and their investigation into reckless endangerment charges against the bonfire participants, information related to Samantha's prescription medication use, and information about her medical condition, including information provided to medical staff for the purpose of her diagnosis and treatment.

89.     BYU, through Dean Heperi, treated this information as evidence that Samantha was dishonest during the Honor Code review.

90.     Dean Heperi, using the medical reports obtained from the police, subjected Samantha to a sexually hostile Honor Code review, taking away her phone and personal belongings, isolating her, making physical affectionate contact with her body, asking intimate questions about her underwear and vagina, accusing her of lying about her vagina, emotionally abusing her, and intentionally inflicting severe emotional distress that has caused her recurring sexual trauma and ongoing post-trauma stress.

91.     Dean Heperi did not offer Samantha any counseling or opportunities to reform as offered to students similarly situated but without her disabilities.

92.     Public policy should preclude punishing the possible victims of sexual assault from coming forward to aid in the investigations.

93.     Discovering that he was being video recorded on August 6, 2012, BYU Police Chief Larry Stott lunged at Samantha's father in an strong-arm attempt to retrieve the video (and that too was recorded), which further inflicted emotional distress on Samantha.  Samantha went back to the police department looking for her father, and overheard female police desk employees (who did not know her) laughing about her alleged rape stating that she deserved it. BYU later notified Samantha and her father that they had been banned from the campus for displaying stress — all events that day were recorded by Samantha's father.  Samantha felt the intentionally inflicted severe emotional distress after leaving the sexual trauma and bullying of the Honor Code review with Dean Heperi.

94.     On August 31, 2012, Samantha received by United States Postal Service a letter from Dean Heperi notifying her that she was receiving an additional year suspension and thence an indefinite suspension (effectively an expulsion) from BYU for: (1) repeated consumption of alcohol; (2) repeated consumption of harmful prescription and non-prescription drugs; (3) violations of the laws of chastity; and (4) dishonesty in the course of the Honor Code investigation.  However, all evidence indicates that she was actually expelled for her mental health disability.

95.     Because of the intentional infliction of severe emotional distress by the BYU On-Campus Housing employees, Samantha was unnecessarily prescribed powerful medications which confused her, and she left the safety of campus life and guidance, to her own peril.

96.     Samantha suffered temporary full paralysis, permanent severe pain, and permanent partial paralysis to her right shoulder, both arms, both hands, and her fingers.

97.     Had it not been for the bullying by BYU On-Campus Housing because of her disability, Samantha would not have injured her hands; subsequently, BYU expelled her mainly because of her mental health which had posed no threat to any other student.

98.     She suffered intentional infliction of severe emotional stress as BYU re-victimized her over the issues of sexuality

99.     She has physical scars from the bottoms of her feet to the top of her head, quite literally.

100.    She lost both her place to live, and her education.

101.    Samantha has been incapacitated since August 31, 2012, mostly without a guardian or conservator.

### FIRST CAUSE OF ACTION

(Housing Discrimination in violation of 42 U.S.C. §§ 12181–12189 and 3601-3619,

Defendants BYU and Drake, Reynolds, and Brown; and John Does #1 and #2)

102.    Samantha hereby incorporates paragraphs **1 through 101** as though fully set forth herein.

103.    BYU and its housing employees Drake, Reynolds, and Brown, knowing that Samantha was in a minority faith and that Samantha had a disability consisting of an eating disorder and anxiety, discriminated against her in the terms, conditions and privileges in the rental of its student housing and furthermore;

104.     Refused to provide reasonable accommodation or even equal treatment in the rules, policies, practices and services necessary to afford Samantha an equal opportunity to enjoy the dwelling;

105.     By requiring her to use highly toxic industrial cleaner without proper protection to clean a public restroom; by calling the police officers John Doe #1 and #2 to have them intrude into her room and have her transported via police car to counseling in the night, and threatening her with imminent eviction without any preparation for alternative place to spend the night;

106.     By publicly criticizing Samantha for her eating disorder in meetings and through gossip involving other residents knowing their conduct would result in a hostile environment and Samantha being ostracized by other residents.

107.     As a direct and proximate cause of the discrimination, Samantha suffered substantial emotional pain and suffering, including but not limited to anxiety, embarrassment, humiliation, and depression.

108.     Ultimately as a direct and proximate cause of the discrimination, Samantha suffered permanent physical pain and permanent injury, loss of home, loss of education, loss of income, and loss of quality of life.

109.     Samantha is subsequently entitled to general, special, and punitive damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

(Battery – Defendants BYU, and Vest and Merrill)

110.   Samantha hereby incorporates paragraphs **1 through 109** as though fully set forth herein.

111.   At the time Samantha was unconscious but with a body temperature of only 104 degrees, defendants Merrill and Vest mishandled Samantha's body, recklessly yanking her from the car by the warm nerves of her shoulders and arms when her body was in a fragile condition and dangerous position.

112.   The conduct of Defendants Vest and Merrill was the direct and proximate cause of Samantha's injuries, including the partial paralysis she suffered in her upper extremities.

113.   Samantha is accordingly entitled to general, special, and punitive damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

(Invasion of Privacy – Defendants BYU and

Vest, Merrill, Judd, Burr, Eyre, and John Doe #1 and #2)

114.   Samantha hereby incorporates paragraphs **1 through 113** as though fully set forth herein.

115.   Information regarding Samantha's medical diagnosis and treatment, and immensely personal information were included in the Defendant Officer's police reports documenting their investigation, and are considered private and controlled records under Utah law.

116.   Defendants John Doe #1 and #2 intruded into Samantha's room when housing reported her eating disorder, and transported her to counseling via police car, and reported it all to BYU Dean of Students Vernon Heperi.  Defendant Officer Vest violated Samantha's right to

privacy when he recklessly disclosed information regarding her medical diagnosis and treatment Dean Heperi. Defendent Officer Merrill violated Samantha's right of privacy by his warrant-less search of her dorm, also reported to Dean Heperi. Defendant detectives Officers Burr and Eyre reported all aspects of their deep investigation of Samantha to Dean Heperi.

117.    Defendant officers further violated Samantha's right of privacy with their investigations into her family and hospital rooms, including their physical examination of her without a warrant while she was nude and unconscious. Defendant officers further violated Samantha's right of privacy when they recklessly and maliciously disclosed the police reports documenting their investigation to BYU Honor Code Office.

118.    The disclosure of these private facts, and protected information was a public disclosure to individuals not involved in the criminal investigation and was provided solely to BYU for the purpose of enforcing its religious policies.

119.    The facts disclosed to Dean Vernon Heperi and the facts disclosed to the Honor Code Office are private and/or protected facts regarding Samantha's mental health diagnosis and treatment, potential sexual assault, and suspected past sexual activity to which Dean Heperi and the Honor Code Office were not entitled to learn from medical staff or law enforcement.

120.    The public disclosure of medical diagnosis and treatment as well as the public disclosures of private intimate information of a potential sexual assault victim obtained during a sexual assault investigation is highly offensive because it is a breach of trust of the alleged victim by law enforcement that serves only to re-victimize the victim and chill the disclosures of sexual assault by future victims.

121.    It is further highly offensive in this circumstance because it allowed Defendant Officers to use their law enforcement authority to further the objective of a private institution under the false pretenses of investigating a crime.

122.    Samantha suffered embarrassment, damage to her reputation, and emotional pain and suffering as a direct and proximate result of defendant officers' invasion of her privacy.

123.    Samantha is accordingly entitled to general, special, and punitive damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

(Breach of Contract – Defendants BYU and Judd, Burr, Eyre)

124.    Samantha hereby incorporates paragraphs **1 through 123** as though fully set forth herein.

125.    Defendants Judd, Burr, and Eyre, in the course of their investigation, used deception in violation of the contractual BYU Honor Code, to induce Samantha's family into another contract to share information which they promised would not affect Samantha academically; all the while knowing that they would breach this contract and share the information with the BYU Honor Code Office.

126.    Samantha suffered embarrassment, damage to her reputation, and emotional pain and suffering as a direct and proximate result of defendant officers' deception and breach of this contract.

127.    Samantha is accordingly entitled to general, special, and punitive damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

(Negligent Infliction of Emotional Distress – BYU and Vernon Heperi)

128.     Samantha hereby incorporates paragraphs **1 through 127** as though fully set forth herein.

129.     Defendants BYU and Dean Vernon Heperi, acting individually and in his capacity as Associate Student Life Vice President & Dean of Students for BYU, intentionally caused emotional stress as the ultimate authority over BYU On-Campus Housing.

130.     Defendants BYU and Dean Vernon Heperi, acting individually and in his capacity as Associate Student Life Vice President & Dean of Students for BYU, intentionally caused emotional stress to Samantha when Dean Heperi ambushed her, for the purpose of proving she was unchaste, with confidential, private, and privileged information regarding the investigation of the possible sexual assault committed against her, including confidential and privileged information provided to investigating officer regarding her physical and mental health, the results of her Code R examination, and private and confidential information provided to medical staff for the purpose of diagnosis and treatment of Samantha for her eating disorder, the injuries she sustained on June 9, 2012, and the potential sexual assault committed against her.

131.     BYU and Dean Heperi further should have known that by exploiting the improper disclosure of confidential, private and privileged information regarding the sexual assault investigation, and Samantha's medical treatment, to prove her unchaste, and to prove she abused prescription medication, or consumed alcohol, and ambushing her with this information, created an unreasonable risk that Samantha would suffer emotional distress.

132.   Dean Heperi further knew that Samantha had prior emotional trauma, and should have known that his isolation, physical contact, intimate setting, and sexual questions would re-traumatize Samantha and inflict emotional distress — he held these intimate conversations in conflict with the BYU Honor Code over which he governs, abusively, a man in his fifties cornering a female teenager to inflict guilt and shame, and self-hatred.

133.   BYU and Dean Heperi further knew or should have known that Samantha was in a compromised state physically and mentally due to the physical and mental injuries she suffered on June 9, 2012, and her ongoing struggle with an eating disorder. Indeed, Dean Heperi was fully aware that Samantha had recently overdosed due to confusion and emotional distress caused by the permanent pain and permanent paralysis of her shoulder, both arms, both hands, and all of her fingers — and therefore should have known that causing further distress to Samantha would result in illness or bodily injury.

134.   As a direct and proximate result of the conduct of Dean Heperi acting individually and within the scope of his employment with BYU, Samantha suffered severe emotional distress resulting in illness and injury.

135.   Samantha suffered embarrassment, damage to her reputation, and emotional pain and suffering as a direct and proximate result of the conduct of BYU and Dean Heperi.

136.   Samantha is accordingly entitled to general, special, and punitive damages in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

(Disability Discrimination in violation of 42 U.S.C. §§ 12181–12189,

Defendants BYU and Vernon Heperi)

137.    Samantha hereby incorporates paragraphs **1 through 136** as though fully set forth herein.

138.    BYU and Dean Vernon Heperi knew that they were expelling Samantha for her psychiatric illness, in violation of the Americans with Disabilities Act, yet they conspired to disguise it as an expulsion for reasons other students are not equally expelled, to intentionally inflict severe emotional distress.

139.    Samantha suffered embarrassment, damage to her reputation, and emotional pain and suffering as a direct and proximate result of the conduct of BYU and Dean Heperi; and Samantha lost her home, education, and future income.

140.    Samantha is accordingly entitled to general, special, and punitive damages in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

(Slander – Defendants IHC and Addie Bradburn)

141.    Samantha hereby incorporates paragraphs **1 through 140** as though fully set forth herein.

142.    Defendant Addie Bradburn, if the police are to be believed, informed the BYU PD that "it was clear that she [Samantha] had participated in sexual intercourse," which later proved to be unfounded and slanderous.

143.    Defendant Addie Bradburn gave access to Samantha's private trauma room to the police to do their own physical examination of Samantha while Samantha was naked and unconscious.

144.    Defendant Addie Bradburn thereby also traumatized Samantha because Samantha was told down-the-line that she was likely sexually assaulted and was under this impression unnecessarily for an indefinite length of days.

145.    Defendant Addie Bradburn had no basis for this presumption other than everyday bruising on Samantha's lower legs and that Samantha was foaming from her mouth and all parts of her body after being comatose in a hot car for 14 hours.

146.    Defendant's actions were the direct and proximate cause of Samantha's getting suspended or expelled from BYU, and suffering from severe emotional distress; and Samantha is subsequently entitled to general, special, and punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

1.    On her first cause of action Samantha prays for judgment against BYU (and its parent entity the LDS Church, COP, or CPB) and GLORY DRAKE, LACY REYNOLDS, JAY BROWN, JOHN DOE #1, and JOHN DOE #2, finding each jointly and severally liable for her physical injuries, emotional pain and mental anguish, loss of home and education, and loss of income, including awarding Samantha:

    a.    General, special, and punitive damages;

    b.    Court cost and fees; and

    c.    Any and all other relief deemed appropriate by the Court.

2.    On her second cause of action Samantha prays for judgment against BYU (and its parent entity the LDS Church, COP, or CPB) and officers JEFF VEST and CRAIG MERRILL,

finding each jointly and severally liable for her physical injuries, severe physical pain, and severe emotional pain and mental anguish, and loss of income, including awarding Samantha:

     a.    General, special, and punitive damages;

     b.    Court cost and fees; and

     c.    Any and all other relief deemed appropriate by the Court.

3.    On her third cause of action Samantha prays for judgment against BYU (and its parent entity the LDS Church, COP, or CPB) and officers JEFF VEST, CRAIG MERRILL, RYAN JUDD, BRAD BURR, ROBERT EYRE, JOHN DOE #1, and JOHN DOE #2; finding each jointly and severally liable for Samantha's emotional pain and mental anguish, and loss of reputation, education, home, and income, including awarding Samantha:

     a.    General, special, and punitive damages;

     b.    Court costs and fees; and

     c.    Any and all other relief deemed appropriate by the Court.

4.    On her fourth cause of action Samantha prays for judgment against BYU (and its parent entity the LDS Church, COP, or CPB) and officers RYAN JUDD, BRAD BURR, and ROBERTY EYRE, finding each jointly and severally liable for her emotional pain and mental anguish, and loss of reputation, loss of home, education, and income, including awarding Samantha:

     a.    General, special, and punitive damages;

     b.    Court cost and fees; and

     c.    Any and all other relief deemed appropriate by the Court.

5.      On her fifth cause of action Samantha prays for judgment against BYU (and its parent entity the LDS Church, COP, or CPB) and VERNON HEPERI finding each jointly and severally liable for her emotional pain and mental anguish, loss of reputation, and loss of home, education, and income, including awarding Samantha:

       a.      General, special, and punitive damages;

       b.      Court cost and fees; and

       c.      Any and all other relief deemed appropriate by the Court.

6.      On her sixth cause of action Samantha prays for judgment against BYU (and its parent entity the LDS Church, COP, or CPB) and VERNON HEPERI finding each jointly and severally liable for her emotional pain and mental anguish, loss of reputation, and loss of home, education, and income, including awarding Samantha:

       a.      General, special, and punitive damages;

       b.      Court cost and fees; and

       c.      Any and all other relief deemed appropriate by the Court.

7.      On her seventh cause of action Samantha prays for judgment against INTERMOUNTAIN HEALTH CARE, INC., and ADDIE BRADBURN,  finding each jointly and severally liable for Samantha's emotional pain and mental anguish, and loss of reputation, home, education, and income, including awarding Samantha:

       a.      General, special, and punitive damages;

       b.      Court cost and fees; and

       c.      Any and all other relief deemed appropriate by the Court.

**JURY DEMAND**

Plaintiff Samantha hereby makes a JURY DEMAND.


DATED this 2nd day of September, 2014.


_____

SAMANTHA R. HAJICEK